UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Terence K. Wolfe,                                          Case No. 8:11-bk-10760-MGW
                                                           Chapter 7

      Debtor.
_____/

Terence K. Wolfe,

      Plaintiff,

vs.                                                        Adv. Pro. No.: 8:11-ap-638-KRM

U.S. Department of Education,
Northeastern University,
FMS, Inc.

      Defendants.
_____/


**MEMORANDUM OPINION AND JUDGMENT**
**GRANTING DISCHARGE OF STUDENT LOAN DEBT**

*Introduction*

The United States Department of Education ("DOE") claims that the debtor owes

$131,685.36 for 22 government insured student loans, all of which originated between 1983 and

1993.[1] The debtor seeks to have these loans discharged, claiming that excepting the debt from

discharge would impose an undue hardship on him pursuant to § 523(a)(8) of the Bankruptcy

Code.[2]

---

[1] Earlier in the proceeding, default judgments were entered against defendants, Northeastern University and FMS, Inc. (Adv. Doc. Nos. 30 and 54).

[2] Adv. Doc. Nos. 1, 121.

In the Eleventh Circuit, debtors who wish to discharge their student loans must meet what is referred to as the "*Brunner* test."[3] Therefore, the debtor must prove that: (1) he cannot maintain a minimal standard of living if forced to repay the loan; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the loan repayment period; and (3) he has made a good faith effort to repay the loan. For the following reasons, the Court finds that the debtor has met his burden of proof on these issues and that his student loans should be discharged.

*Background Facts*

Terence K. Wolfe (the "debtor") filed this Chapter 7 case on June 3, 2011, at age 47. Some 23 years earlier, in 1988, he earned a bachelor's degree in English, *magna cum laude*, from Northeastern University. Thereafter, he enrolled in graduate school at the University of Virginia, where he first studied Philosophy, then, Government and Foreign Affairs. The debtor did not earn a graduate degree. In 1991, he enrolled in the night program at George Mason University Law School. The debtor was a Dean's Scholar, the winner of a moot court competition, and named "best oral advocate." He was also the editor of the independent Civil Rights Law Journal. But, in 1995, just six weeks before graduation, the debtor was expelled as a result of an honor code violation.[4] The debtor made inquiries to other law schools, but did not seek admission. Thus, the debtor never graduated from law school and maintains that he has never recovered, either personally or professionally, from the expulsion.

---

[3] *Brunner v. New York State Higher Educational Services Corp.*, 831 F.2d 395 (2nd Cir. 1987), adopted by the Eleventh Circuit in *Hemar Ins. Corp. of America, et al. v. Cox (In re Cox)*, 338 F.3d 1238, 1240 (11th Cir. 2003).

[4] The reasons for the expulsion are not germane to this proceeding, but the debtor describes it as the result of conflict with certain students and faculty who orchestrated a "sham honor code proceeding against [him] to wrest control from 'him' of an independent student-edited law journal."

Between 1983 and 1993, the debtor obtained student loans to finance his education. He testified that he made some payments on his undergraduate loans prior to 1991, but the amounts and dates of these payments were not specified. The debtor concedes that he has made no payments on any student loans since the repayment period began in 1996. In 2004, the debtor wrote to the Department of Education seeking an administrative review of his obligations; but, the debtor maintains that he received no response.[5] The debtor has not applied to participate in any available income-contingent debt repayment program.

Even though the debtor is intelligent, well-educated and has distinct literary and professional skills, he has held full-time employment for only 35 months during the past 21 years. In 1992, he got a temporary job at the Copyright Royalty Tribunal, but lost that job in 1993. He was unemployed throughout 1994. During the loan repayment period, from 1996 through 2005, the debtor had no full-time employment.[6] From 1998 to 2004, while living in West Virginia, the debtor worked part-time as a law clerk for a Martinsburg, West Virginia, law firm.[7] The debtor supplemented his part-time income by working as a theater stagehand; these supplemental earnings ceased after he was injured in an accident.

In 2004, the debtor moved to Florida. Some 14 months later, he obtained his first full-time job, as a paralegal in a Jacksonville law firm at an annual salary of $40,000; but, he was fired in September 2006 after only six months.

---

[5] Pl. Ex. 9, "2004 12-09 Request for Administrative Review."

[6] Pl. Ex. 7, "Terence Wolfe Work Record 1991-2012."

[7] The debtor generally described his experience at this firm as one of betrayal, where he was encouraged by the prospect of being given additional work and hours, which never occurred.

3

Between June and October of 2006, the debtor sought treatment for depression, anxiety, and other issues. He attended seven sessions with a Jacksonville psychotherapist, Michael Pruitt, M.D., paid for by Florida Vocational Rehabilitation. The debtor lacked money to proceed any further after that subsidy ended. He testified that for a time he tried certain medications prescribed by Dr. Pruitt, but they ultimately were either too costly or ineffective.

At trial, the Court viewed the video deposition of Dr. Pruitt, who testified from his recollection and notes of his seven sessions in 2006. [8] According to Dr. Pruitt, some of these issues are life-long, not likely to remit without active treatment, and are likely to interfere with work performance and relationships. In his view, these disorders are likely to make it difficult for the debtor to perform in a position where there is potential stress, or where there is any personal interaction required. Although Dr. Pruitt had not treated the debtor in nearly seven years (and could not say for certain that the debtor was currently suffering from the same issues), he found it plausible that, without treatment, the debtor will continue having the same difficulties finding and maintaining work.[9]

In August 2007 the debtor moved to Tampa, when he obtained a job as a paralegal at a salary of $50,000 per year, with the Solomon Tropp law firm. But, he was forced to resign, in the midst of conflict, less than seven months later.[10]

---

[8] The video deposition took place on March 23, 2012. The Assistant United States Attorney attended the deposition by telephone. On March 26, 2012, the Court entered an order requiring that any mental health records be deemed confidential and that such records, documents, information and pleadings relating to the debtor's psychotherapy, diagnoses and treatment be filed under seal. The transcript of Dr. Pruitt's video deposition was filed under seal on August 3, 2012, per Notice of Filing, Adv. Doc. No. 188.

[9] There was no independent medical exam conducted for this proceeding. The debtor lacked funds to pay for one and DOE was unable to obtain one before trial.

[10] The debtor filed a suit against the Solomon firm for unpaid salary of $2,000.00, in which his bankruptcy trustee abandoned any interest. At the time of trial, that suit remained pending.

At trial, his supervisor at the firm, attorney Sabrina Solomon, described his problems through a series of internal office e-mails:

> "On February 27, 2008, Mrs. Solomon advised the debtor that "a general consensus is emerging regarding [the debtor's] perceived self-sabotaging habits." According to Ms. Solomon, these perceived habits included "[d]ifficulty interacting with [the debtor's] co-workers in a team-centered effort ... [and having] [d]emeaning communications with just about everybody."[11]

> "On February 29, 2008, Mrs. Solomon conveyed to a fellow attorney at the firm that Mrs. Solomon could not put the debtor on anything but collections because "no one else [would] have him." Moreover, Mrs. Solomon conveyed that she would "be reluctant to give [the debtor] new work without a significant consistent change in his demeanor and conduct."[12]

Mrs. Solomon testified that she believed the debtor was bright and capable, but he "rubbed a number of people the wrong way," got "very nervous when [the managing partner] sends out a 'do it now' email," and that at times [the debtor] "gets really shaken up and anxious."[13]

The debtor promptly obtained another job, as a paralegal at Guarnieri, Martinez & Odom P.A., at a salary of $50,000 per year. Again, the debtor became embroiled in conflict. He filed an Equal Employment Opportunity ("EEO") complaint against the firm. At trial, the firm's managing partner, R. Eugene Odom, testified that the debtor "often communicated with others in an aggressive and unprofessional manner" and "lacked the temperament and responsibility

---

[11] Pl. Ex. 16, "Email from Sabrina Solomon to Terry Wolfe (February 27, 2008)."

[12] Pl. Ex. 18, "Email from Sabrina Solomon to Drew Baldwin (February 29, 2008)."

[13] Pl. Ex. 14, "Emails by and between Sabrina Solomon and Drew Baldwin (February 21, 2008)." The debtor also filed a complaint with The Florida Bar against his superiors at the Solomon firm. The firm responded to Bar counsel that: "Early in Mr. Wolfe's employment, our firm administrator began receiving complaints regarding Mr. Wolfe's abrupt, abrasive and antagonistic communications with Firm staff and with Firm clients." Pl. Ex. 19, "Response to Florida Bar (April 16, 2008)."

required by his position."[14]  The debtor was fired from the Guarnieri firm in August, 2008.  He

has not worked full-time since.

In 2007, and again in 2009, the debtor sent his resume by email to thousands of members

of the Florida Bar and government agencies in an effort to find employment.  He received only a

few interviews and no job offers.  In 2011, the debtor sought employment as a jury clerk in the

Tampa Division of the United States District Court.  When he did not get an interview, he filed

an EEO complaint against the Clerk of the District Court.  Ultimately, the claim was dismissed.

When this adversary proceeding began, the debtor was receiving unemployment benefits

of $1,182.50 per month; these ended in December 2011.  Shortly before the trial, the United

States Social Security Administration determined that the debtor is disabled.  As a result, the

debtor now receives disability payments of $1,126.00 per month, his sole source of income.

Mr. Wolfe testified that his monthly expenses as listed in his bankruptcy schedules, total

about $1,061.42, including $0 for housing because he has been paying no rent to his landlord

who is being foreclosed by the mortgagee.  The debtor drives a 21 year old truck that he owns

free and clear.  The Chapter 7 trustee filed a Report of No Distribution, indicating that the debtor

did not own any non-exempt assets that would be available for distribution to creditors.[15]

*Analysis*

I.    ***The Amount Owed.***    At trial, Rubio Canlas, a "loan analyst" and "records

custodian" for DOE, testified about copies of documents regarding 22 student loans totaling

$131,685.36.  DOE's Exhibits 1B, 1D, and 1E are copies of (a) loan applications bearing Mr.

Wolfe's signature and his promise to repay the stated amounts; and (b) payment histories for

---

[14]  Pl. Ex. 13A, "Martinez and Odom Response to EEOC Complaint (February 16, 2009)."

[15]  Paperless docket entry, July 9, 2011.

each of these loans. The defendant's Exhibit 1C, however, includes copies of "Indemnification Agreements" from American Student Assistance ("Guaranty Agency") when it purportedly assigned loans to DOE. There is nothing to establish that the debtor is the obligor on the $38,924.38 of student loan debt referenced in Def. Exh. 1C. Mr. Canlas conceded that he had no personal knowledge of any of the loans or statements and claims referenced in the Indemnification Agreements. Mr. Canlas could not testify from personal knowledge whether Mr. Wolfe owed any of the alleged debt evidenced by Exhibit 1C. Accordingly, the defendant has established only that the debtor owes $92,760.98.

## II.    *The "Undue Hardship" Standard.*

Educational loans guaranteed by the government are presumptively excepted from discharge unless a debtor can show, by a preponderance of evidence, that excepting the debt from discharge "will impose an undue hardship on the debtor and the debtor's dependents."[16] The Bankruptcy Code does not define "undue hardship" or list any of the metrics by which such a finding is to be made.

Since 2003, bankruptcy courts in the Eleventh Circuit are required to apply the *Brunner* test, first developed in 1987 by the Second Circuit:

> (1) whether the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loan;

> (2) whether additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan(s); and

---

[16]  11 U.S.C. § 523(a)(8).

(3) whether the debtor has made a good faith effort to repay the loan(s).[17]

A determination of "undue hardship" is a case-specific, fact-dominated standard.[18]   If any one of the requirements of the *Brunner* test are not met, the student loan is not dischargeable.[19]  Some courts have boiled this test down to a "certainty of hopelessness."[20]

The debtor filed a motion requesting that this Court refrain from applying the *Brunner* test, arguing that it is inconsistent with the language of § 523(a)(8) and amounts to "judicial overkill" of the statutory requirement of "undue hardship."[21]  The debtor requests that the so-called "totality of the circumstances" test, applicable in the Eighth Circuit, be applied in this proceeding.

There is merit to the argument that the rigors of the *Brunner* test are no longer appropriate to curb borrower abuse from a premature discharge amidst only temporary financial distress.  When *Brunner* was decided in 1985, the version of § 528(a)(8) then in effect presumptively excepted from discharge government-backed student loans for five years after they first become due, unless the debtor could prove that such obligation would impose an undue

---

[17]  *Cox*, 338 F.3d at 1240.  The *Brunner* test is also applied in the Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits.  *See Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 300 (3d Cir. 1995); *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 400 (4th Cir. 2005); *United States Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 91 (5th Cir. 2003); *Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 359 (6th Cir. 1994); *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993); *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1114 (9th Cir. 1998); *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1309 (10th Cir. 2004).  The Eighth Circuit has adopted a different approach, the totality-of- the-circumstances" test, in *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554-55 (8th Cir. 2003).  The First Circuit has declined to adopt either test.  *See Bronsdon v. Educ. Credit Mgmt. Corp.*, 435 B.R. 791, 797 (1st Cir. BAP 2010); *Nash v. Conn. Student Loan Found. (In re Nash)*, 446 F.3d 188, 190-91 (1st Cir. 2006) ("[W]e see no need in this case to pronounce our views of a preferred method of identifying a case of 'undue hardship.' ").

[18]  *See Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013).

[19]  *See, e.g., In re Faish*, 72 F.3d at 306.

[20]  *See, e.g., In re Roberson*, 999 F.2d at 1136.

[21]  Adv. Doc. No. 194.

hardship.  Otherwise, such loans were automatically dischargeable after five years of the

repayment period had lapsed.  In *Brunner,* the debtor sought to discharge student loans less than

a month after the first payment came due and only seven months after the debtor received her

master's degree.[22]

In 1990, § 523(a)(8) was amended to lengthen to seven years the period before a student

loan could be automatically discharged.[23]  In 1998, the provision was amended, again, to

eliminate any automatic discharge, leaving a showing of "undue hardship" as the only means by

which a student loan could ever be discharged.[24]  In 2005, § 523(a)(8) was amended yet again to

add student loans from private lenders as being presumptively excepted from discharge.[25]

Over time, courts have grafted sub-elements to each of the three parts of the *Brunner* test.

Proof of these sub-elements may force debtors into inconsistent positions or difficult burdens of

proof.  How does a debtor, for example, prove that financial circumstances will not improve in

the future, a "future" which was five years long when the *Brunner* test was first adopted, but

which may now be 25 years or longer?  How do debtors prove that in the midst of a "certainty of

hopelessness," they attempted to maximize their income?"

Lately, there have been calls for rethinking the *Brunner* test.  In a 2013 Ninth Circuit

Bankruptcy Appellate Panel decision, Bankruptcy Judge Pappas stated in his concurring opinion

---

[22] *Brunner,* 46 B.R. at 753.  The District Court had reversed the bankruptcy court's finding of undue hardship, concluding that the record did not support such a finding when the debtor's current inability to pay had not been proven to be for a significant part of the repayment period, which had only just begun. *Id.* at 758.  The expressed intent of the drafters of the Bankruptcy Code – to curb abuse arising from a premature discharge of student loans -- played a significant role in the District Court's decision. *Id.* at 754.

[23] Pub. L. No. 101-647, § 3621(1)(1990).

[24] Higher Education Amendments of 1998, Pub. L. No. 105-244, § 971(a)(1998).

[25] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, §220 (2005).

that the *Brunner* test "is too narrow, no longer reflects reality, and should be revised by the Ninth

Circuit when it has the opportunity to do so."[26] Judge Pappas observed that the *Brunner* test now

requires bankruptcy courts to "predict a debtor's potential to repay a six-digit educational

obligation over his or her entire lifetime."[27] He went on to state that courts should "focus on the

contemporary world of student loan debt, not circumstances that existed thirty or more years

ago."[28]

     Likewise, in a 2013 decision the Seventh Circuit upheld a bankruptcy court's decision to

discharge the student loans of a destitute 53 year old woman on a finding that her job search

efforts were an utter futility. The court (per Judge Easterbrook) cautioned:

> "The district judge did not doubt that [the debtor] has paid as much as she
> could during the 11 years since receiving the educational loans. Instead
> the [district] judge concluded that good faith entails commitment to future
> efforts to repay. Yet, if this is so, no educational loan *ever* could be
> discharged, because it is always possible to pay in the future should
> prospects improve. Section 523(a)(8) does not forbid discharge, however;
> an unpaid educational loan is not treated the same as a debt incurred
> through crime or fraud. The statutory language is that a discharge is
> possible when payment would cause an 'undue hardship.' It is important
> not to allow judicial glosses, such as the language in *Roberson* and
> *Brunner*, to supersede the statute itself."[29]

     Notwithstanding the developing case law in this area, this Court is not free to abandon the

*Brunner* test in favor of a legal standard that is not applicable in the Eleventh Circuit. In any

event, doing so is not necessary because the debtor's proof meets the requirements of the

*Brunner* test, as set forth below.

---

[26] *Roth v. Educ. Credit Mgmt. Corp.*, 490 B.R. 908, 920 (9th Cir. BAP 2013).

[27] *Id.* at 922.

[28] *Id.* at 923.

[29] *Krieger*, 713 F.3d at 884.

1.    *Can the debtor maintain, based on current income and expenses, a "minimal" standard of living for himself if forced to make payments on the loan debt alleged by the defendant?*

Generally, there is no simple formula by which to assess a debtor's ability to maintain a "minimal" standard of living. This usually requires a detailed and complicated assessment of the debtor's income, expenses and lifestyle.[30] And, courts while stopping short of requiring that the debtor live at the poverty level, generally require that the debtor show something more than temporary financial adversity.[31]

In this case, there is no dispute as to the debtor's minimal standard of living. For two decades, the debtor has had only 35 months of full-time employment. He does not own a home. He drives a 21-year old truck and has no other assets of value. The debtor's living expenses are modest, being only about $1,000 per month. He is not married and has no financial support from anyone. Furthermore, he does not seem to possess or enjoy any extravagances whatsoever.

The issue is whether excepting the student loans from the discharge will prevent the debtor from maintaining a minimal standard of living. For 21 years, the debtor's earned income has been sporadic, with multiple interruptions lasting for long periods of time. At times, the debtor's income, summarized below,[32] has been no better than at the subsistence level (the years of the initial loan repayment period are shown in bold):

---

[30] *See Faish*, 72 F.3d at 306-07.

[31] *In re Mallinckrodt*, 274 B.R. 560, 566 (S.D. Fla. 2002); *see In re Matthews-Hamad*, 377 B.R. 415, 421 (Bankr. M.D. Fla. 2007).

[32] Pl. Exh. 11.

|      | Annual Income |
|------|---------------|
| 1991 | $ 26,294.82   |
| 1992 | 0.00          |
| 1993 | 21,478.54     |
| 1994 | 2,103.13      |
| 1995 | 15,718.52     |
| **1996** | **18,807.69** |
| **1997** | **21,141.52** |
| **1998** | **0.00**      |
| **1999** | **18.00**     |
| **2000** | **1,183.00**  |
| **2001** | **20,259.00** |
| **2002** | **5,565.37**  |
| **2003** | **22,620.47** |
| **2004** | **24,530.15** |
| **2005** | **0.00**      |
| 2006 | 25,936.71     |
| 2007 | 16,377.81     |
| 2008 | 35,529.19     |
| 2009 | 2,523.10      |
|      | $260,082.02   |

During the entire ten-year loan repayment period – 1996 to 2005 – the debtor's average annual income was $11,412.00, or about $951.00 per month.[33]  Since 2010, the debtor has lived on unemployment benefits of $1,183.00 per month and, since mid-2012, SSI disability payments of about $1,126.00 each month.  The debtor's monthly expenses will most likely increase when he loses his current rent-free lodging after his landlord is evicted by the foreclosing mortgagor. Whenever the debtor is required to pay for his lodging, the small difference between his current expenses and monthly income will be extinguished.

DOE argues that the debtor would likely not be required to make any payments under its contingent-income repayment program, particularly if the debtor's income falls below the

---

[33] The debtor's average gross income from 1991 to 2009 is about $13,689.00 per year, an average of about $1,140.00 per month

12

poverty level – currently $11,490.00 per year for a single person.[34]  In effect, the DOE argues

that a required payment of $0 cannot, by definition, push a debtor below a minimal standard of

living.

      But, in this case, where the debtor is living just above the poverty level and has no excess

income, a contingent-income program would likely do him more harm than good.  Courts have

reasoned that enrollment in a program offering the contingent obligation to pay even $0 need not

be considered decisive of the first part of the *Brunner* test if a debtor's minimal expenses exceed

income.[35]  In this case, the debtor has no excess income and is likely unable to make any future

payments on his student loans.  Further, during the contingent repayment period, which could

last as long as 25 years, interest will continue to accrue on the debt.  After the expiration of the

repayment period, the loan will likely be forgiven, at which time debtor will incur a tax liability

due to the taxable income arising from the debt forgiveness.[36]  If the debtor is unable to pay the

forgiveness-of-income tax liability (a non-dischargeable debt).  The debtor may be exposed to

setoffs by the government against future Social Security payments to collect the taxes.

Therefore, I conclude that the debtor has met his burden of showing that he cannot maintain a

minimal standard of living if forced to repay his student loan debt.

---

[34]  2013 U.S. Department of Health and Human Services Poverty Guidelines, http://aspe.hhs.gov/poverty/13poverty.cfm.

[35]  *See Williams v. Am. Educ. Serv. (In re Williams)*, 492 B.R. 79, 90 (Bankr. M.D. Ga. 2013); *Bush v. U.S. Dep't of Educ. (In re Bush)*, 450 B.R. 235, 241 (Bankr. M.D. Ga. 2011).

[36]  This problem has been recognized by the Eleventh Circuit in *Educ. Credit Mgmt. Corp. v. Mosley*, (*In re Mosley*), 494 F.3d 1320, 1327 (11th Cir. 2007).

2.    *Do "additional circumstances" exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period?"*

It is generally stated that a debtor must show that the inability to pay student loan debt in the future arises from reasons beyond his control.[37] Courts must consider any "additional circumstances," such as education, work history, health and other relevant circumstances, and how they will influence the debtor's ability to repay the student loans.[38]

The debtor's hardship must be more than the normal hardship that accompanies bankruptcy.[39] Although the extended inability to pay may be premised on some form of illness or disability, it is sufficient for the debtor to establish that there are additional circumstances, which are linked to the inability to pay for a significant portion of the repayment period.[40]

In this case, the evidence shows a pattern, of more than two decades' duration, of the debtor's inability to obtain or hold a decent job for any significant time. The debtor testified credibly about his dysfunctional upbringing, his persistent low energy level, and his recurring feelings of sadness. He also testified that the medications prescribed by Dr. Pruitt were either too expensive or ineffective. The debtor testified credibly about his history of conflicts with employers and his difficulty relating to people. The debtor's testimony is replete with examples

---

[37] *In re Matthews-Hamad*, 377 B.R. at 421-22; *In re Johnson*, 299 B.R. 676, 680 (Bankr. M.D. Ga. 2003).

[38] *See In re Matthews-Hamad*, 377 B.R. at 422; *see also Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir. 2005).

[39] *Frushour*, 433 F.3d at 401 (debtor failed to prove the second prong of *Brunner* test because she failed to establish any additional circumstances, beyond the burden of the debt itself, that showed an undue hardship); *Educ. Credit Mgmt. Corp. v. Carter (In re Carter)*, 279 B.R. 872, 877 (M.D. Ga. 2002) (finding appellee had not met her burden of demonstrating additional circumstances that would prevent her from making her loan payments in the future without failing below the minimal standard of living).

[40] *Oyler*, 397 F.3d at 386; *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 444 (9th Cir. BAP 2004) ("The circumstances need to be 'exceptional' only in the sense that they demonstrate insurmountable barriers to the debtor's financial recovery and ability to pay.").

of interpersonal conflict. And, the debtor's testimony on these matters is substantially corroborated by the testimony of his recent employers, Ms. Solomon and Mr. Odom.

Dr. Pruitt testified that, in 2006, he believed the debtor suffered from depression and other personality disorders. Dr. Pruitt also found plausible the nexus between these disorders and the debtor's unusual work history. He opined further that the debtor would be unable to retain employment on a long-term basis and these disorders are likely to persist for a significant time into the future, and most likely for the rest of his life.[41] Dr. Pruitt was a credible witness.

In 2012, shortly before the trial, the Social Security Administration determined that the debtor is disabled, entitling him to monthly SSI payments. The Social Security Administration's determination is quite likely a result of Dr. Pruitt's assessment of the debtor's personality and anxiety disorders.[42]

The DOE has challenged these claims, arguing that the debtor cannot be unemployable because he has held jobs in several occupations over the last 15 to 20 years. The DOE also cites examples of the debtor's ability to function at a high level and of inconsistencies between the debtor's claim to have disabling depression and his failure to claim that disability in his earlier job searches. The DOE, in effect, challenges the debtor's claim that he suffers disabling depression.

---

[41] Dr. Pruitt testified that the disorders faced by the debtor have made it impossible for him to function in a normal workplace and would likely continue to do so for the foreseeable future.

[42] According to the debtor, he first sought SSI disability in 2010, but was denied. The process was repeated without success. In July 2012, after the debtor reapplied with the video deposition of Dr. Pruitt, his application for disability status was approved.

But, in 2007, the Eleventh Circuit declined to adopt a rule requiring independent medical evidence to corroborate a debtor's testimony.[43] In *Mosley*, the debtor was the sole witness regarding his medical problems, work history and living situation. The Eleventh Circuit affirmed the discharge of the student loans where the finding of undue hardship was based primarily on the debtor's detailed testimony.

Even though the present record may not support a finding of the debtor's precise medical or mental conditions, the record supports a finding that his failures in the workplace are the result of involuntary "additional circumstances." This Court has carefully observed the demeanor of the debtor and has carefully considered his testimony and the corroborating testimony of the other witnesses. The Court has considered the debtor's age, education, and work history as they bear on his claim that he is unable to earn a stable income or improve his financial situation in the future.

As the DOE concedes in its brief, the debtor has not been able to hold down any job for more than a period of months.[44] There is a long pattern of abnormal employment that could not have been contrived just for this litigation. Even though the debtor has been employed in jobs paying up to $50,000 per year, he soon thereafter became disengaged or aggrieved; then he subsequently quit or was fired, with the result that he never earned a full year's salary. At least three times, the debtor has sued a former or prospective employer over such perceived grievances. A similar pattern occurred in the debtor's academic pursuits at the University of

---

[43] *Educ. Credit Mgmt. Corp. v. Mosley (In re Mosley)*, 494 F.3d 1320 (11th Cir. 2007). The bankruptcy court discharged Mosley's $45,000 of student loans, concluding that the debtor had made a credible showing of being "in a vicious cycle of illness and homelessness" that prevented him from working and that repayment could be an undue hardship. The appeal focused on whether the debtor, having presented no independent corroborating medical evidence, had met his burden of proof through his own testimony. *Id.* at 1325-26.

[44] Def. Trial Br., at 7-10.

Virginia and George Mason University Law School.  It is entirely credible, and the Court so finds, that (a) the debtor's mental and personality disorders are real, involuntary and long-term and (b) he is unable to function in a work environment for any sustained period.  The Court also finds it highly unlikely that this pattern of dysfunction will change in the future to enable the debtor to earn enough income to make any meaningful payment on his student loans.

By the debtor's testimony, the record of his sporadic work history over 21 years, Dr. Pruitt's testimony of a plausible nexus between personality disorders and the abnormal work history, and the corroborating testimony of recent employers, the debtor has established by a preponderance of the evidence that the state of his financial affairs derives from additional circumstances that likely existed throughout the initial ten-year repayment period and will likely persist for the rest of his life.  Because the debtor has a long, sustained history of not being able to hold a mid-level job for more than short, sporadic periods, which pattern plausibly derives from mental health or personality problems, it is unlikely he will ever be able to repay his student loans.

3.    *Has the debtor made a good faith effort to repay the loans?*

Under the *Brunner* test, "good faith" is to be measured by a debtor's efforts to obtain employment, maximize income, minimize expenses, and repay the loans.[45]  The issue, ultimately, is whether the defaults result, not from voluntary choices, but from factors beyond the debtor's reasonable control."[46]  The DOE argues that the debtor cannot satisfy the good faith requirement because he has not made a payment since at least 1995, despite being employed on

---

[45] *Mosley*, 494 F.3d at 1327.

[46] *Id.*

17

several occasions at as much as $50,000 a year, and because he never enrolled in a contingent-income payment plan.[47]

During most of the last 21 years, however, the debtor has been unemployed or underemployed. After his expulsion from law school, from 1996 through 2005, the debtor's work and income were unstable. His annual income fluctuated from $24,530.00 to $0 and averaged only $11,412.52 per year, or $951.00 per month, over the decade in which the student loans were due to be repaid. During that period, he did obtain jobs that paid $18,807.00 (1996), $21,141.00 (1997), $20,259.00 (2001), $22,620.00 (2003) and $24,530.00 (2004); but, in the other five years, (1998 to 2000, 2002 and 2005), his earned income was next to nothing.

Over the entire initial repayment period, the debtor was able to maintain only a "minimal" standard of living. He testified credibly that he lacked the means to make any meaningful payments on his student loans while earning income only sporadically. He worked part-time at the West Virginia law firm for seven years in anticipation of more than part-time work; but he was never elevated to full-time employment.

The debtor also has a pattern of obtaining a decent paying job, only to lose it amidst conflict, then suffer through periods of greatly reduced income. None of that appears to be voluntary or intentional. The debtor testified credibly that he was not able to make payments on his student loans because of the necessity to pay for living expenses in the intervening "down" periods. Failure to make even minimal voluntary payments is not a lack of good faith if a debtor did not have sufficient income to make them.[48]

---

[47] Def. Trial Br., at 18-20.

[48] *In re Roth*, 490 B.R. at 918.

There is no evidence that the debtor took out the student loans with an intention of defaulting, or of discharging them. The debtor's testimony that he had made payments on his undergraduate loans before going to law school was unrebutted. There is nothing in the record to suggest that while not making any payments on the subject loans, the debtor was accumulating assets or incurring other debts. The Court concludes that the debtor's failure to make payments on his loans since 1996 is justified.

Likewise, to say that a debtor is *always* obligated to agree to a long-term repayment plan and forego a discharge to prove "good faith" is simply an incorrect proposition of law.[49] As discussed above, a contingent-income repayment plan is likely to be severely prejudicial to this debtor, whose working life is mostly behind him and who shows no likelihood of ever making meaningful payments on his student loans. There is no *per se* rule in the Eleventh Circuit that a debtor must enroll in a contingent income repayment plan to satisfy the "good faith" requirement.[50] Eventually, enrollment in such a program will likely lead to a future forgiveness of an even larger debt and a significant income tax liability. In the circumstances of this case, the debtor's failure to participate in a long term repayment plan is not a lack of good faith.

The DOE also argues that the debtor has not diligently sought work, describing his email job search as purposefully ineffective. To support its argument, the DOE points to the debtor's

---

[49] *Krieger*, 713 F.3d at 884.

[50] *Mosley*, 494 F.3d at 1327 (income contingent repayment programs are not always a viable option for debtors because any debt that is discharged under the program is treated as taxable income; debtors are effectively trading one nondischargeable debt for another.); *In re Champagne*, 2012 WL 293736, at *4 (Bankr. M.D. Fla. 2012) (taking into account that student loan forgiveness under income contingent plans is subject to non-dischargeable income taxes under the current tax code). Likewise, the Ninth Circuit BAP has recognized the same problem. *In re Roth*, 490 B.R. at 920 ("Potentially disastrous tax consequences could await her at the termination of the twenty-five year payment period . . . .").

being contacted in 2007 about a legal secretary position, but turning the job offer down.[51]  The

DOE alleges that the debtor is being too picky in his career search to warrant a good faith

finding.

      The debtor testified, however, that he accepted a different job offer less than a month

after he declined the legal secretary position.  The Court is not persuaded that this single

occurrence evidences a failure by the debtor to maximize his income.  In fact, he later moved

across the state to take the paralegal job in Tampa.  The debtor's testimony about searching for

jobs across a broad spectrum – including paralegal, tour coordinator, teacher, electrician and a

dozen other types of jobs – was also credible.  Indeed, the debtor did seek out and obtain several

professional-level jobs during and after the loan repayment period, all of which were short-lived.

In light of the debtor's efforts, the Court concludes that the debtor has made sufficient attempts

to find employment and to maximize income.[52]

      There is no evidence in the record that the debtor failed to minimize his expenses.  He

does not have any assets of value and, as of trial, did not pay any rent.  There is no indication that

the debtor has made any unnecessary purchases or enjoys any material extravagances.  There is

no real issue that the debtor has minimized his expenses, as a necessity, to match his low average

income.

      Thus, the debtor has satisfied the good faith requirement.  The Court is not persuaded

otherwise by DOE's argument that bad faith is evidenced by the debtor's "off-the-cuff" remark

at the hearing on its motion to continue the trial:

---

[51]  Def. Trial Br., at 19.

[52]  The DOE questions the debtor's strategy of using blast emails to contact prospective employers.  Although, the efficacy of the debtor's approach may be questioned, the fact remains that the debtor made these efforts, beginning in 2007, and did obtain the Tampa law firm positions several years before filing for bankruptcy.

"This case is tethering me to Florida. There is a good chance I may wish to leave Florida to pursue better economic opportunities elsewhere once this matter is concluded."[53]

It is not plausible that after two decades of failure in the workplace, the debtor will be able to flip the switch and succeed. The debtor is not Ms. Brunner, who sought to discharge her student loan at the beginning of her career and less than a month after the first payment came due. Although this debtor may hold hope for a better future, it is not a lack of good faith to do so.

## Conclusion

In the late 1980's, the *Brunner* test performed a necessary gatekeeping function when the statute allowed an automatic discharge after only five years. Relying on comments in the legislative history, courts developed and refined the *Brunner* test to focus more on whether a debtor was gaming the system (by discharging student loan debts while looking to reap the future financial rewards from the financed education), than on the nature or extent of the undue hardship. An "overly restrictive interpretation of the *Brunner* test fails to further the Bankruptcy Code's goal of providing a 'fresh start' for the honest but unfortunate debtor."[54]

Nevertheless, the Court has evaluated this debtor's "undue hardship" through the *Brunner* framework. Although the debtor is intelligent and is able, from time to time, to perform at a very high level, he has been unable, for more than two decades, to maintain full-time employment for any meaningful length of time. The debtor is living at a minimal standard of living and it is unlikely that he will ever be able to repay these loans. The debtor testified, credibly and in great detail as to the origins and consequences his personality difficulties have had in his life and, in particular, in the workplace. The debtor's work history was not contrived to support his claims

---

[53] Def. Trial Br., at 22-23.

[54] *Polleys*, 356 F.3d at 1308.

in for this case. The debtor's testimony is corroborated by Dr. Pruitt and two former employers and establishes the presence of some combination of personality and mental disorders that are plausibly linked to his abnormal work history. Because most of the debtor's working years are behind him, and because the debtor struggles to maintain a minimal standard of living, the failure to make meaningful payments on his student loans and the failure to participate in an income-contingent repayment plan are not a lack of good faith.

Therefore, the debtor has met his burden to prove that excepting the student loans guaranteed by DOE will be an "undue hardship" on him.

## JUDGMENT

Accordingly, it is hereby

ORDERED that the plaintiff's Motion for Abandonment of *Brunner* and Substitution for it of the Totality of the Circumstances Test (Adv. Doc. No. 194) is denied;

And, it is further

ORDERED that final judgment be entered for the plaintiff that he is hereby discharged by 11 U.S.C. §523(a)(8) from any and all liability on student loans owed to, or guaranteed by, the defendant, United States Department of Education.

**DONE** and **ORDERED** in Tampa, Florida, on October 4, 2013.

K. Rodney May
United States Bankruptcy Judge

The Clerk's office is directed to serve a copy of Plaintiff and Counsel for Defendant.

22